*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

File Name: 06a0096p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

————————

MICHAEL A. GENORD, M.D., JOHN R. SANBORN, M.D., PAULA M. FISHBAUGH, M.D., ANDREA L. SCHILLER, M.D., MARK D. DYKOWSKI, M.D., JOHN E. ECKELE, M.D., and BETTY S. CHU, M.D.,
        *Plaintiffs-Appellees,*

   *v.*

BLUE CROSS & BLUE SHIELD OF MICHIGAN,
        *Defendant-Appellant.*

No. 04-2486

————————

Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.
No. 03-72950—Bernard A. Friedman, Chief District Judge.

Argued: January 31, 2006

Decided and Filed: March 14, 2006

Before: RYAN, CLAY, and GILMAN, Circuit Judges.

————————

## COUNSEL

**ARGUED:** Joseph A. Fink, DICKINSON, WRIGHT, PLLC, Detroit, Michigan, for Appellant. William H. Horton, COX, HODGMAN & GIARMARCO, Troy, Michigan, for Appellees. **ON BRIEF:** Joseph A. Fink, Kathleen A. Lang, Phillip J. DeRosier, DICKINSON, WRIGHT, PLLC, Detroit, Michigan, for Appellant. William H. Horton, COX, HODGMAN & GIARMARCO, Troy, Michigan, for Appellees. Joanne Geha Swanson, Michael A. Sneyd, Daniel J. Schulte, KERR, RUSSELL & WEBER, Detroit, Michigan, for Amici Curiae.

————————

## OPINION

————————

RONALD LEE GILMAN, Circuit Judge. The named gynecologists sued Blue Cross & Blue Shield of Michigan, alleging that Blue Cross had fraudulently denied their claims in violation of both the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. § 1964(c), and various state laws. Blue Cross moved for dismissal on the ground that the district court lacked subject matter jurisdiction because the civil RICO action was "reverse preempted" by Michigan law in accordance with a provision of a federal statute commonly known as the McCarran-Ferguson Act, 15 U.S.C. § 1012. The district court denied Blue Cross's motion, thus allowing the civil RICO

1

claim to proceed. After the district court certified the issue for interlocutory appeal, a panel of this court exercised its discretion to grant Blue Cross's petition to have the jurisdictional issue decided on an interlocutory basis. For the reasons set forth below, we **AFFIRM** the judgment of the district court.

## I.    BACKGROUND

### A.    Michigan's Nonprofit Health Care Corporation Reform Act

Blue Cross is a "health care corporation" that is regulated extensively by the Michigan Commissioner of Insurance under the Nonprofit Health Care Corporation Reform Act, Michigan Compiled Laws §§ 550.1101-1704 (Health Care Act). Under the Health Care Act, Blue Cross is required to enter into reimbursement agreements with various medical providers. Mich. Comp. Laws § 550.1504(1) ("A health care corporation shall, with respect to providers, contract with or enter into a reimbursement arrangement to assure subscribers reasonable access to, and reasonable cost and quality of, health care services . . . ."). Several provisions of the Health Care Act regulate the content of the reimbursement agreements. *See, e.g.*, Mich. Comp. Laws § 550.1502 (setting forth licensing requirements that must be met before providers are eligible to participate).

Under the Act, Blue Cross can also structure reimbursement plans for an entire class of providers, such as "medical doctors" or "pharmacies." *See* Mich. Comp. Laws §§ 550.1505-1509. Such a provider-class plan requires the approval of the Michigan Commissioner of Insurance to ensure that the plan advances the goals set forth in the Health Care Act. Mich. Comp. Laws §§ 550.1504, 550.1506 (including goals such as assuring the availability and quality of medical services). Individual provider agreements in turn contain provisions implementing such provider-class plans.

The reimbursement agreements require that the providers request payment for services rendered to Blue Cross's individual policyholders by submitting to Blue Cross a claim form containing standardized billing codes. Participating providers must agree to accept payment at the regulated rate as payment in full for their services covered under the plan. Mich. Comp. Laws §§ 550.1107(2), 550.1502(1).

### B.    The doctors

The doctors sued on their own behalf and on behalf of a "statewide class of persons defined as all physicians performing gynecological medical services who, from November 1, 2002, to the date of certification, provided any services to any patient insured by or who was a member or beneficiary of any plan administered by Defendant." November 1, 2002 is the date on which the doctors allege that Blue Cross changed its billing codes for gynecological services and started systematically denying payment. At the time the district court ruled on Blue Cross's motion to dismiss, the class had not yet been certified.

### C.    The claims asserted by the doctors

In their amended complaint, the doctors allege four counts against Blue Cross: a civil RICO claim, an alleged violation of Michigan Compiled Laws § 500.2006 for failing to remit payment to the doctors within 45 days, and common-law claims of breach of contract and unjust enrichment. The district court had supplemental jurisdiction over the state-law claims.

In order to make out a civil RICO claim, the doctors must establish that they were "injured in [their] business or property by reason of a violation" of the criminal RICO provisions contained in 18 U.S.C. § 1962. *See* 18 U.S.C. § 1964(c). If such a claim is successful, they are entitled to treble damages and attorney fees. *Id.*

The doctors in this case claimed that, after Blue Cross changed its gynecological billing codes, it and other affiliated entities constituted an "enterprise" that, through a "common scheme, systematically denied and delayed payments due to physicians . . . , improperly paid reduced amounts, or made the claims process so daunting that some claims were simply abandoned or otherwise lost." According to the doctors, this scheme was perpetuated by Blue Cross falsely rejecting claims for payment through mailings and transmittals by wire (violations of 18 U.S.C. § 1341 for mail fraud and of 18 U.S.C. § 1343 for wire fraud).

**D.        Blue Cross's motion to dismiss**

Blue Cross filed a motion under Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure to dismiss the civil RICO claim and the Michigan Compiled Laws § 500.2006 claim for failure to timely remit payment. The district court granted Blue Cross's motion as to the § 500.2006 claim because the Michigan statute does not provide for a private right of action.

In its motion to dismiss the civil RICO claim, Blue Cross argued that the district court lacked subject matter jurisdiction because the McCarran-Ferguson Act prevents the invocation of a private right of action under RICO. The district court denied Blue Cross's motion, thus allowing this part of the case to proceed. On appeal, Blue Cross is challenging the district court's ruling only as to the civil RICO count and not as to the § 500.2006 count.

## II.    ANALYSIS

**A.        Standard of review**

Blue Cross argues that the district court lacked subject matter jurisdiction over the doctors' civil RICO claim. We review the district court's decision on this issue de novo. *Simon v. Pfizer Inc.*, 398 F.3d 765, 772 (6th Cir. 2005) ("District Court decisions on motions to dismiss under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6) are generally subject to a *de novo* standard of review.").

**B.        The McCarran-Ferguson Act and "reverse preemption"**

The McCarran-Ferguson Act declares that "[t]he business of insurance, and every person engaged therein, shall be subject to the laws of the several States which relate to the regulation or taxation of such business." 15 U.S.C. § 1012(a). In the section specifically relied upon by Blue Cross, the Act provides that "[n]o Act of Congress shall be construed to invalidate, impair, or supersede any law enacted by any State for the purpose of regulating the business of insurance, . . . unless such Act specifically relates to the business of insurance . . . ." 15 U.S.C. § 1012(b). Federal law thus provides for "reverse preemption" in the realm of regulating the insurance business. *AmSouth Bank v. Dale*, 386 F.3d 763, 780-83 (6th Cir. 2004) (discussing the concept of reverse preemption under the McCarran-Ferguson Act). A general federal law that does not specifically relate to the business of insurance, therefore, cannot be construed to "invalidate, impair, or supersede" a state law enacted to regulate the insurance business. 15 U.S.C. § 1012(b).

The McCarran-Ferguson Act, however, provides an "antitrust exception" to the reverse-preemption rule. After setting forth the above rule, the Act goes on to say that the Sherman Act, the Clayton Act, and the Federal Trade Commission Act "shall be applicable to the business of insurance to the extent that such business is not regulated by State law." *Id*.

In its motion to dismiss the civil RICO claim, Blue Cross argued that Michigan's Health Care Act was enacted to regulate the business of insurance, and that the doctors' claims would "invalidate, impair, or impede" the state's law. This claim must be analyzed under the McCarran-Ferguson Act.

Pursuant to the Act, we are required to answer three questions. The threshold question is whether the federal statute at issue "specifically relates to the business of insurance." If it does, then the McCarran-Ferguson Act by its own terms does not allow for reverse preemption. *See* 15 U.S.C. § 1012(b) (setting forth as an exception to the reverse-preemption rule a case in which the federal law in question "specifically relates to the business of insurance"). If not, then there are two remaining questions that both must be answered in the affirmative in order to conclude that application of a federal law is reverse preempted by the existence of a state law. One is whether the state statute at issue was "enacted . . . for the purpose of regulating the business of insurance." The other is whether the application of the federal statute would "invalidate, impair, or supersede" the state statute. *Kenty v. Bank One, Columbus, N.A.*, 92 F.3d 384, 392 (6th Cir. 1996) (setting forth the McCarran-Ferguson Act analysis).

Both parties agree that the civil RICO statute does not specifically relate to the business of insurance. *See also id*. at 391 (holding as a preliminary matter that "RICO does not 'specifically relate to the business of insurance'"). The other two questions required to be answered by the Act remain.

## C.     Whether the Health Care Act was "enacted for the purpose of regulating the business of insurance"

The Supreme Court in *United Labor Life Insurance Co. v. Pireno*, 458 U.S. 119, 129 (1982), addressed the antitrust exception of the McCarran-Ferguson Act and set forth three criteria for what constitutes the "business of insurance": (1) "whether the practice has the effect of transferring or spreading a policyholder's risk," (2) "whether the practice is an integral part of the policy relationship between the insurer and the insured," and (3) "whether the practice is limited to entities within the insurance industry." Affirmative responses to these criteria indicate that the practice *is* the "business of insurance," but "[n]one of these criteria is necessarily determinative in itself." *Id*.

Eleven years later, in *United States Department of Treasury v. Fabe*, 508 U.S. 491, 501-05 (1993), the Supreme Court discussed the general rule of the McCarran-Ferguson Act, asking whether a state's insolvency-priority statute could be classified as a law "enacted . . . for the purpose of regulating the business of insurance." The Court held that the Act's general rule covers a "broad category of laws . . . [that] necessarily encompasses more than just the 'business of insurance.'" *Id*. at 505.

In *Owensboro National Bank v. Stephens*, 44 F.3d 388 (6th Cir. 1994), this court explained the interaction between *Pireno* and *Fabe*. The court stated that "[w]hether a particular activity is part of the 'business of insurance' is, of course, a separate question from whether a state law was 'enacted . . . for the purpose of regulating the business of insurance.'" *Id.* at 392. The *Pireno* inquiry concerning whether an activity is part of the "business of insurance," however, can inform the *Fabe* inquiry of whether a law was "enacted . . . for the purpose of *regulating* the business of insurance." (emphasis added). *Stephens* thus held that "to have been 'enacted . . . for the purpose of regulating the business of insurance,' [the state law] must possess the aim of regulating activities that meet the *Pireno* criteria" set forth above. *Id*. Each *Pireno* criteria will therefore be addressed in turn.

### 1.     Does the Health Care Act have the aim of regulating a practice that has the effect of transferring or spreading policyholder risk?

In *Group Life & Health Insurance Co. v. Royal Drug Co.*, 440 U.S. 205, 211 (1979), the Supreme Court was faced with the question of whether certain agreements between Blue Shield (operated by Group Life) and various pharmacies constituted the "business of insurance." If someone insured by Blue Shield purchased a prescription drug from a pharmacy that had signed a "pharmacy agreement" with Blue Shield, the insured was required to pay only $2.00 for each

prescription. *Id*. at 209. Blue Shield would then pay the balance of the prescription cost to the pharmacy. *Id*. Pharmacies without "pharmacy agreements" brought an antitrust action, alleging violations of the Sherman Act. *Id*. at 207. The Court held that the pharmacy agreements were not part of the "business of insurance" because they did not transfer or spread policyholder risk, but "serve[d] only to minimize the costs Blue Shield incur[red] in fulfilling its underwriting obligations." *Id*. at 213-14. "Such cost-savings arrangements may well be sound business practice, and may well inure ultimately to the benefit of policyholders in the form of lower premiums, but they are not the 'business of insurance.'" *Id*. at 214.

Turning to the present case, the doctors' allegations deal with the denial and delay of reimbursement payments due them for services rendered. Their claims, as in *Royal Drug*, relate to how a company like Blue Cross goes about making health care services available to its policyholders. In *Royal Drug*, Blue Shield provided $2.00 prescriptions to its policyholders by way of pharmacy agreements. Here, the Health Care Act allows Blue Cross to make gynecological services available to its policyholders by way of reimbursement agreements with doctors that require the doctors to send their invoices to Blue Cross containing the disputed billing codes. Neither type of agreement (the pharmacy agreement or the billing-code-reimbursement agreement) can be said to transfer or spread policyholder risk. *Royal Drug*, 440 U.S. at 213. The first *Pireno* criterion is therefore unsatisfied on the facts of this case.

### 2.          *Does the Health Care Act have the aim of regulating a practice that is an integral part of the policy relationship between the insurer and the insured?*

*Fabe* is instructive with respect to this second *Pireno* criterion. In *Fabe*, the Supreme Court addressed the application of the McCarran-Ferguson Act to the clash between a state bankruptcy statute and the federal Bankruptcy Code over the priority of payments when an insurance company is liquidated. *Fabe*, 508 U.S. at 493, 502. First priority is to the United States Government under the federal bankruptcy provision, whereas the state statute prioritizes administrative expenses, certain wage claims, policyholders' claims, and claims of general creditors above claims of the federal government. *Id*. at 495-96. The Court focused on the provisions of the state bankruptcy statute that go to the "actual performance of an insurance contract" because those provisions are an "essential part of the 'business of insurance.'" *Id*. at 505, 509 n.8. According to the Court, the preference for the policyholders' claims was enacted "'for the purpose of regulating the business of insurance' to the extent that it serves to ensure that, if possible, policyholders ultimately will receive payment on their claims." *Id*. at 506. The administrative-expenses priority also falls into that category because "the expenses of administering the insolvency proceeding [are] reasonably necessary to further the goal of protecting policyholders." *Id*. at 509. As to "[t]he preferences conferred upon employees and other general creditors, however, [they] do not escape pre-emption because their connection to the ultimate aim of insurance is too tenuous." *Id*.

*Fabe* thus stands for the proposition that, in determining what is integral to the policy relationship, the focus is on the extent to which the state law furthers the interests of the policyholders. *Royal Drug* also supports that conclusion, noting that Blue Shield had promised its policyholders to provide them with prescription drugs at a cost of $2.00 per prescription, and "[s]o long as that promise is kept, policyholders are basically unconcerned with arrangements made between Blue Shield and participating pharmacies." *Royal Drug*, 440 U.S. at 214. What constitutes an "integral part of the policy relationship" is therefore determined by reference to the interests of the policyholders.

Recognizing that the focus is on the interests of the policyholders, Blue Cross argues that, because the billing arrangements between it and the doctors may result in a lower health care cost

to the public, the arrangements are an integral part of the policy relationship. But this is an argument that the *Royal Drug* Court considered and rejected:

> At the most, the petitioners have demonstrated that the Pharmacy Agreements result in cost savings to Blue Shield which may be reflected in lower premiums if the cost savings are passed on to policyholders. But, in that sense, every business decision made by an insurance company has some impact on its reliability, its ratemaking, and its status as a reliable insurer. . . . Such a result would be plainly contrary to the statutory language, which exempts "the business of insurance" and not the "business of insurance companies."

*Id.* at 216-17.

In this case, Blue Cross fails to explain how the Health Care Act's regulation of the billing-code invoicing arrangement with health care providers furthers the interests of the policyholders. Contrary to Blue Cross's argument, this is not a case like *Fabe* where the state law requires the insurance company to pay the claims of the *policyholders* (a true case of "actual performance" of an insurance contract). The claims in dispute here are those of the medical providers, not the policyholders. This case is therefore more like *Royal Drug* because the policyholders are unconcerned with the reimbursement arrangements between Blue Cross and the doctors so long as they receive medical treatment as contemplated by their agreement with Blue Cross. *See Royal Drug*, 440 U.S. at 214. Because the provider-agreement and reimbursement provisions of the Health Care Act do not have the aim of regulating a practice that is an integral part of the policy relationship between the insurer and the insured, *Pireno*'s second criterion is unsatisfied on the facts of this case.

### 3.       *Does the Health Care Act have the aim of regulating a practice that is limited to entities within the insurance industry?*

In *Pireno*, the Supreme Court noted that this inquiry is not dispositive, but nonetheless is "mandated by the *Royal Drug* analysis." *Pireno*, 458 U.S. at 133. The Court held that there is not a per se rule that practices involving noninsurance-industry entities always fall outside of the "business of insurance." *Id*. Rather, courts should take this factor into account because "[a]rrangements between insurance companies and parties outside the insurance industry can hardly be said to lie at the center of [the] legislative concern" of "protect[ing] *intra*-industry cooperation in the underwriting of risks." *Id*. (citation and quotation marks omitted).

Blue Cross does not argue that the doctors involved in this litigation are "entities within the insurance industry." And, as set forth in Part II.C.1. above, the billing arrangements between Blue Cross and the doctors do not involve the spreading of risk. The provisions of the Health Care Act relating to those billing arrangements therefore "can hardly be said to lie at the center of . . . legislative concern." *Id*. As a result, the third *Pireno* criterion is also unsatisfied.

In sum, none of the three *Pireno* criteria are met in this case. The billing arrangements do not transfer or spread policyholder risk, but instead allow Blue Cross to furnish gynecological services to its policyholders by way of third-party providers. The parts of the Health Care Act at issue are also not an integral part of the policy relationship because the policyholders are largely unconcerned with how the doctors get paid, so long as the policyholders are provided with gynecological services. And finally, because the doctors are not entities within the insurance industry, the Health Care Act provisions relating to their billing arrangements do not "lie at the center of . . . legislative concern" of the McCarran-Ferguson Act. *Id*.

**D.      Whether the civil RICO claim would "invalidate, impair, or supersede"
          Michigan's Health Care Act**

The provisions of the Health Care Act that are at issue simply do not "possess the aim of regulating activities that meet the *Pireno* criteria." *Stephens*, 44 F.3d at 392. Because the reimbursement provisions were not "enacted . . . for the purpose of regulating the business of insurance," we need not reach the remaining McCarran-Ferguson-Act issue of whether the application of the civil RICO statute "invalidate[s], impair[s], or supersede[s]" the Health Care Act. *See* 15 U.S.C. § 1012(c). Blue Cross's claim of reverse preemption therefore fails and the doctors' civil RICO claim should be allowed to proceed.

## III.    CONCLUSION

For all of the reasons set forth above, we **AFFIRM** the judgment of the district court.