# IN THE SUPREME COURT OF TEXAS

No. 18-0216

TEXAS MUTUAL INSURANCE COMPANY, HARTFORD UNDERWRITERS INSURANCE
COMPANY, TASB RISK MANAGEMENT FUND, TRANSPORTATION INSURANCE
COMPANY, TRUCK INSURANCE EXCHANGE, TWIN CITY FIRE INSURANCE COMPANY,
VALLEY FORGE INSURANCE COMPANY, ET AL., PETITIONERS,

v.

PHI AIR MEDICAL, LLC, RESPONDENT

ON PETITION FOR REVIEW FROM THE
COURT OF APPEALS FOR THE THIRD DISTRICT OF TEXAS

JUSTICE GREEN, joined by CHIEF JUSTICE HECHT, dissenting.

This case requires us to determine whether the federal Airline Deregulation Act (ADA) preempts the Texas Workers' Compensation Act's (TWCA) reimbursement scheme as it relates to air-ambulance transport claims. The Court concludes that it does not because PHI Air Medical, LLC (PHI) cannot show that the challenged reimbursement scheme "relate[s] to a price, route, or service of an air carrier." 49 U.S.C. § 41713(b)(1). Because I believe that a reimbursement scheme that regulates the amount an insurer must pay to reimburse an air carrier is such a law, I would conclude that the challenged scheme is preempted by the ADA. Additionally, I would conclude that the McCarran–Ferguson Act (MFA) does not save the reimbursement scheme because neither

the TWCA nor its reimbursement scheme was "enacted . . . for the purpose of regulating the business of insurance." 15 U.S.C. § 1012(b). Therefore, I respectfully dissent.

## I. Airline Deregulation Act

When Congress enacted the ADA, it included a broad preemption provision to prevent states from passing laws that would undo federal deregulation. *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 383–84 (1992). That express preemption clause states that the ADA preempts state "law[s] related to a price, route, or service of an air carrier." 49 U.S.C. § 41713(b)(1). Thus, for the ADA to preempt the TWCA's reimbursement scheme, that scheme must (1) "relate[] to a price, route, or service" (2) "of an air carrier."[1] *Id.*

The United States Supreme Court has frequently acknowledged the breadth of the ADA's "related to" provision and unequivocally stated that it "is much more broadly worded" than comparable preemption provisions. *Nw., Inc. v. Ginsberg*, 572 U.S. 273, 283 (2014); *see Am. Airlines, Inc. v. Wolens*, 513 U.S. 219, 229 n.5 (1995); *Morales*, 504 U.S. at 384–85; *see also Rowe v. N.H. Motor Transp. Ass'n*, 552 U.S. 364, 370–71 (2008). The ADA preempts a state law if it "ha[s] a connection with, or reference to [air] carrier '[prices], routes, or services'"; if the state law affects a price, route, or service, even indirectly; or if the state law has a "significant impact" on Congress's deregulatory or preemption-related objectives. *Rowe*, 552 U.S. at 370–71 (emphasis removed) (citations omitted). The ADA's preemption provision is not limited to only those state laws that prescribe a price, route, or service. *Morales*, 504 U.S. at 385 (noting that if the ADA only preempted state laws prescribing a price, then it would have stated it preempts state laws that "regulate" rather than "relate to" a price, route, or service of an air carrier). Rather, it includes

---

[1] I agree with the Court that PHI qualifies as an air carrier as defined by the ADA.

2

those state laws that "encroach upon the area of exclusive federal concern." *See Alessi v. Raybestos-Manhattan, Inc.*, 451 U.S. 504, 525 (1981). But the ADA will not preempt a state law if it is related in "'too tenuous, remote, or peripheral a manner' to have pre-emptive effect." *Morales*, 504 U.S. at 390 (quoting *Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85, 100 n.21 (1983)).

The TWCA's reimbursement scheme is related to an air ambulance's prices because it indirectly limits the amount that an air carrier may charge for its services. Under the TWCA, when an air-ambulance transport renders a service that qualifies as a medical benefit under Texas workers' compensation insurance, it must bill that amount to the insurer. TEX. LAB. CODE § 408.027(a). And the insurer is responsible for paying that claim. *Id.* § 408.027(b). Further, the payment must be "in accordance with the fee guidelines authorized under" the TWCA and its corresponding regulations. *Id.* § 408.027(f). Consistent with this authorization, the Labor Code and the Division of Workers' Compensation (Division) have standardized the amount an insurance provider must pay for a transport from companies like PHI. Namely, the Labor Code identifies that the reimbursement amount "must be fair and reasonable" in a way that "ensure[s] the quality of medical care" and administers "medical cost control." *Id.* § 413.011(d); *see* 28 TEX. ADMIN. CODE § 134.1(f). All parties agree that such a requirement means an insurer may not pay, either by its own determination or after review by the Division, an amount that exceeds a "fair and reasonable" rate. *See* TEX. LAB. CODE § 413.011(d); 28 TEX. ADMIN. CODE § 134.1(f).

Thus, rather than limit what price an air ambulance may charge the insurer, the reimbursement scheme refocuses its limitation on the amount the insurer must pay. In reality, there is no difference. It does not matter whether PHI cannot recoup the price of its services because it is limited in what it can charge or because the insurer is limited in what it must pay. Put

3

differently, if state law required PHI to bill an insurance company a "fair and reasonable" rate, would that limit not relate to an air carrier's price, even though it would directly limit what an air carrier may charge? I think it must. *See Valley Med Flight, Inc. v. Dwelle*, 171 F. Supp. 3d 930, 942 (D.N.D. 2016) (holding that the ADA preempted a North Dakota law limiting the amount that air-ambulance transports could bill to an amount consistent with the insurance provider's fee schedule). Surely, then, "compelling or restricting" a specific payment relates to a price. *Morales*, 504 U.S. at 389 (citing *Ill. Corp. Travel, Inc. v. Am. Airlines, Inc.*, 889 F.2d 751, 754 (7th Cir. 1989)); *Air Evac EMS, Inc. v. Sullivan*, 331 F. Supp. 3d 650, 663 (W.D. Tex. 2018) ("Because the TWCA effectively determines what [an air-ambulance transport company] can charge by restricting the amount it can receive for its services, the [reimbursement scheme] relate[s] to [an air carrier]'s prices."). Either statutory regime compels the same result, and both would be "designed" to relate to a price of an air carrier. *See Morales*, 504 U.S. at 386 (quoting *Ingersoll—Rand Co. v. McClendon*, 498 U.S. 133, 139 (1990)) ("[A] state law may 'relate to' a benefit plan, and thereby be pre-empted, even if the law is not specifically designed to affect such plans, or the effect is only indirect."). And Congress, when it decided to deregulate air carrier prices, did so with the understanding that its deregulation would allow air carriers to set their own prices—not the state or those who pay air carriers consistent with state guidelines. *See id.* at 378.

Other courts have held that state-law caps on insurer reimbursement for air-ambulance transports are preempted by the ADA because such laws establish a mandatory fixed maximum rate for reimbursement. *See EagleMed LLC v. Cox*, 868 F.3d 893, 902 (10th Cir. 2017). And the Court today relies on *Cox* to distinguish Texas's reimbursement scheme. The Court concludes that because the TWCA's reimbursement scheme is a generally applicable law that does not

expressly state what an insurer must pay an air-ambulance provider, then it is preempted only if it has a forbidden significant effect on PHI's prices. *Ante* at ___. The Court goes on to hold that, because the fair and reasonable amount required by the TWCA could be consistent with PHI's billed price, the reimbursement scheme does not relate to PHI's prices as a matter of law given that it does not always have that forbidden effect. *Ante* at ___. Yet the Supreme Court has stated that the ADA preempts even those state laws "'consistent' . . . with federal regulation." *Rowe*, 552 U.S. at 370 (citing *Morales*, 504 U.S. at 386–87). Thus, evidence that a state regulation could result in the same price that an air carrier would set itself as a result of deregulation does not mean that law does not "relate[] to" "a price" of an air carrier. 49 U.S.C. § 41713(b)(1). And the record reflects that the reimbursement scheme does relate to PHI's prices.

After the insurers paid PHI based on the reimbursement scheme, PHI sought a medical fee dispute resolution before the Division, which ultimately concluded that reimbursement should be "fair and reasonable," amounting to 125 percent of Medicare service rates. The administrative law judge determined on appeal that the "fair and reasonable" rate was 149 percent of Medicare service rates. PHI asserted, in defense of its claim that insurers should pay the price that they are billed, that the ADA preempts the TWCA. *See Scarlett v. Air Methods Corp.*, 922 F.3d 1053, 1061 (10th Cir. 2019) (concluding that the ADA could be used defensively to entitle an air-ambulance provider to its billed charge). The administrative law judge then ordered the insurers to pay an amount consistent with this newly determined "fair and reasonable" amount. Under both approaches—125 or 149 percent—the amount owed was less than the amount PHI charged. After the adjustment, the requisite payment for each transport would be between $9,989 and $28,000

less than the price charged to the insurer. This underpayment "surely 'relates to' price." *See Morales*, 504 U.S. at 389 (citing *Ill. Corp. Travel*, 889 F.2d at 754).

The fact that the court in *Cox* struck both the balance-billing prohibition and the limit on insurer reimbursement is telling. 868 F.3d at 901. If the Court is correct in its suggestion today that PHI is the victim of its own pleading, *ante* at___, and the TWCA is not preempted because the balance-billing prohibition was only challenged in the alternative, then why is it that *Cox* specifically concluded that limiting the amount that an insurer can reimburse is related to price? 868 F.3d at 901. In other words, if balance billing is truly what relates to price here, then why was a scheme that capped reimbursement at a fixed amount relevant to whether that cap relates to price? I see no distinction.

The TWCA's reimbursement scheme plainly sets a maximum amount for which PHI can be compensated by the insurer, which PHI is statutorily required to bill for its services. *See* TEX. LAB. CODE § 408.027(a)–(b). That maximum amount is a fair and reasonable price as determined by the insurer or the Division. *See id.* § 413.011(d); 28 TEX. ADMIN. CODE § 134.1(f). At best, this is the price that these parties believe the market would set, rather than the amount that the market actually sets. *See Morales*, 504 U.S. at 378; *see also EagleMed, LLC v. Travelers Ins.*, 424 P.3d 532, 539 (Kan. Ct. App. 2018) (concluding that the ADA preempts "a price sanctioned by the State rather than one determined by market forces as Congress intended"). The scheme thus clearly relates to PHI's prices because it controls the amount that PHI is entitled to collect from the insurer, the party from whom the TWCA prescribes reimbursement of medical benefits. *See* TEX. LAB. CODE § 408.027(a)–(b).

6

In *Sabre Travel International, Ltd. v. Deutsche Lufthansa AG*, 567 S.W.3d 725 (Tex. 2019), we concluded that a tortious interference claim was "too tenuous, remote, or peripheral" to an air carrier's prices to be preempted by the ADA. *Id.* at 738. The tortious interference claim arose from a booking company's conduct that occurred after an airline ticket was purchased and independently of determining the price of a ticket. *Id.* We explained that the passive booking costs imposed on an airline company by a third-party booking agent went to airline cost alone, and not price. *Id.* at 737–38. Sabre could not demonstrate that those third-party costs were anything more than costs, and thus those costs were "too tenuous, remote, or peripheral" to the airline's prices for purposes of preemption. *Id.* at 738. Here, PHI has shown that the TWCA's reimbursement scheme goes directly to price, as the scheme determines the amount that insurers will reimburse air-ambulance providers for their services. And the record indicates that application of that reimbursement scheme to PHI has a clear effect on what it collects from the insurers responsible for payment of medical benefits.

The Supreme Court has said that the ADA "stops States from imposing their own substantive standards with respect to [prices], routes, or services, but not from affording relief to a party who claims and proves that an airline dishonored a term the airline itself stipulated." *Wolens*, 513 U.S. at 232–33. That is why state laws that relate to price, and not breach-of-contract claims that relate to price, are preempted by the ADA. When breach-of-contract claims are at issue, air carriers have electively set their own terms. *Id.* "[T]he ADA's overarching deregulatory purpose . . . mean[s] 'States may not seek to impose their own public policies or theories of competition or regulation on the operations of an air carrier.'" *Id.* at 229 n.5 (citation omitted). The TWCA does just that. It imposes standards that regulate the amount an air carrier like PHI

7

may collect from those required to pay medical benefits, effectively limiting what it may charge. For these reasons, I would hold that the TWCA's reimbursement scheme "relate[s] to a price . . . of an air carrier." 49 U.S.C. § 41713(b)(1).

## II.      McCarran–Ferguson Act

Although I would conclude that the ADA preempts the TWCA's reimbursement scheme, the scheme can nevertheless be saved by the MFA's "reverse preemption" provision if the TWCA in general, or its reimbursement scheme in particular, qualifies as a law enacted for the purpose of regulating the business of insurance. 15 U.S.C. § 1012(b). Because the TWCA and its origins show that the Legislature enacted the TWCA as a tort reform measure, and the United States Supreme Court has prescribed a particular meaning to the term "business of insurance," I would conclude that the statute, both as a whole and with respect to the challenged reimbursement scheme, was not enacted for the purpose of regulating the business of insurance.[2]

### A.      Purpose, Structure, and Effect of the TWCA

Analyzing whether the MFA reverse preempts a state statute requires a two-tiered approach. First, we "consider[] the overall purposes, structural framework, and effect of the entire state law" in determining whether the MFA saves the reimbursement scheme from preemption. *Fredericksburg Care Co. v. Perez*, 461 S.W.3d 513, 521 (Tex. 2015). If the law in its entirety was not enacted for the purpose of regulating the business of insurance, then we proceed to determine

---

[2] To be sure, parts of the TWCA very well may be laws enacted for the purpose of regulating the business of insurance, and the concurrence today notes a few in its analysis. However, those provisions, while instructive on whether the TWCA was enacted to regulate the business of insurance, do not transform the TWCA into such a law. Rather, the MFA would protect those provisions from preemption if challenged. *See U.S. Dep't of Treasury v. Fabe*, 508 U.S. 491, 508–09 (1993) (holding that only *part* of an Ohio statute prioritizing certain creditors and policyholders over the federal government in bankruptcy was a law enacted for the purpose of regulating the business of insurance). And, as discussed in Part II.B, the provisions that are directly challenged—the reimbursement scheme that regulates what an insurer must pay a provider—fall short of how the Supreme Court has interpreted and applied the MFA.

8

whether the specifically challenged provisions fall within the ambit of the MFA. *Id.* at 525. Guiding this analysis, though, is the language of the MFA itself. Although we analyze the statute holistically and then particularly, we must be mindful that the MFA is about "the relationship between the insurance company and its policyholders." *Fabe*, 508 U.S. at 501. State laws may come within the scope of the MFA if they control "the type of policy which could be issued, its reliability, interpretation, and enforcement." *SEC v. Nat'l Sec., Inc.*, 393 U.S. 453, 460 (1969). Regardless of these considerations, our focus should be on whether the statute is "aimed at protecting or regulating [the insurer–policyholder] relationship, directly or indirectly." *Id.* Thus, I begin with whether the TWCA was enacted to regulate the insurer–policyholder relationship.

The concurrence relies on the fact that the TWCA allows the Texas Department of Insurance to "administer and operate the workers' compensation system" and directs the Department to approve those policies administered in Texas to conclude that the TWCA falls within the scope of the MFA. *Ante* at ___; *see* TEX. LAB. CODE § 402.001; *Fairfield Ins. Co. v. Stephens Martin Paving, LP*, 246 S.W.3d 653, 658 (Tex. 2008). This approach, though, conflates mechanisms with purpose. We have previously recognized that while the TWCA may offer employees relief as insurance beneficiaries and employers coverage as policyholders, the TWCA exists to assist both the employee and employer with job-related injuries:

> The purpose of the Act is to provide employees with certainty that their medical bills and lost wages will be covered if they are injured. An employee benefits from workers' compensation insurance because it saves the time and litigation expense inherent in proving fault in a common law tort claim. But a subscribing employer also receives a benefit because it is then entitled to assert the statutory exclusive remedy defense against the tort claims of its employees for job related injuries.

*Tex. Mut. Ins. Co. v. Ruttiger*, 381 S.W.3d 430, 441 (Tex. 2012) (quoting *HCBeck, Ltd. v. Rice*, 284 S.W.3d 349, 350 (Tex. 2009)); *see Tex. Workers' Comp. Comm'n v. Garcia*, 893 S.W.2d 504,

9

511 (Tex. 1995). As the Division recognizes, the TWCA offers an alternative to the common law, under which "injured workers were [often] denied recovery." *Garcia*, 893 S.W.2d at 510 (citation omitted). This was in response to harsh complete defenses employers could invoke to limit or avoid liability. *Id.* The original act eliminated these complete defenses in exchange for a prohibition on an injured employee's ability to bring a claim against a subscribing employer in a variety of circumstances. *See* Act of Mar. 29, 1913, 33d Leg., R.S., ch. 179, §§ 1, 3, 1913 Tex. Gen. Laws 429, 429–30. At the heart of this exchange was the *employer–employee relationship* and the resolution of job-related injuries. In this way, the purpose of the original act was to ensure the injured employee's entitlement to certain benefits while maintaining an employer's limited liability.[3] *Id.* §§ 3, 6–16, 1913 Tex. Gen. Laws 429, 430–32; *see Garcia*, 893 S.W.2d at 510–11. We have explained:

> The Employers' Liability Act of 1913 replaced the common law negligence remedy with limited but more certain benefits for injured workers. Acts of 1913, 33d Leg., ch. 179. The Texas act, which was part of a nationwide compensation movement, was perceived to be in the best interests of both employers and employees. . . . Employees injured in the course and scope of employment could recover compensation without proving fault by the employer and without regard to their or their coworkers' negligence. Acts of 1913, ch. 179, pt. I, §§ 7–12. In exchange, the employer's total liability for an injury was substantially limited. *Id.* § 3. Although employers were allowed to opt out of the system, the act discouraged this choice by abolishing all the traditional common law defenses for non-subscribers. *Id.* § 1.

*Garcia*, 893 S.W.2d at 510–11 (footnote omitted).

Because the original workers' compensation act proved unsatisfactory for a variety of reasons, the Legislature adopted a revised TWCA that attempted to restore the tradeoff

---

[3] The Act even said as much: "An Act relating to employers' liability and providing for the compensation of certain employe[e]s and their representative and beneficiaries. . . ." Act of Mar. 29, 1913, 33d Leg., R.S., ch. 179, 1913 Tex. Gen. Laws 429, 429.

10

contemplated under the original version. *Id.* at 511–12; *see* TEX. LAB. CODE § 408.001(a); *see also* TEX. LAB. CODE § 402.021(d). It did so without modifying its intent. Even after the amendments, the TWCA continues to protect both the injured worker and the employer by ensuring recovery for on-the-job injuries without regard to the employee's own negligence, while limiting the employer's liability. *See Ruttiger*, 381 S.W.3d at 441; *In re Poly-Am., L.P.*, 262 S.W.3d 337, 350 (Tex. 2008). That the Legislature offers the employee relief through private insurance does not transform the entire TWCA into a law enacted for the purpose of regulating the business of insurance. *See Fabe*, 508 U.S. at 502–03, 508–09 (concluding that though a portion of a statute was enacted for the purpose of regulating the business of insurance, the entire statute was not). To conclude otherwise would require that we ignore the history and origins of the TWCA itself. *See Waak v. Rodriguez*, ___ S.W.3d ___, ___ (Tex. 2020).

The structure of the TWCA demonstrates that its purpose is to provide a policy tradeoff between the employer and employee with respect to on-the-job injury claims. *See Tex. W. Oaks Hosp., LP v. Williams*, 371 S.W.3d 171, 186 (Tex. 2012). The concurrence asserts that the TWCA is administered through private insurers and thus cannot be accomplished without private insurance contracts. *Ante* at ___. While that is true for *subscribing* employers, the concurrence fails to recognize that workers' compensation insurance is but one remedy the Legislature envisioned to improve an employee's recovery for on-the-job injuries and an employer's protection in that process. *See* TEX. LAB. CODE § 406.033(a) (removing common law defenses in workers' compensation claims for non-subscribing employers). When the structure of the TWCA

11

is examined, its purpose to offer employee and employers alike a remedy for on-the-job injuries becomes visible.[4]

First, the TWCA incentivizes employers to opt in. *See id.* It encourages, but does not require, an employer to elect into its provisions. *See id.* § 406.002(a) ("Except for public employers and as otherwise provided by law, an employer *may* elect to obtain workers' compensation insurance coverage.") (emphasis added). If an employer elects to participate in the workers' compensation system, and the employer's employee does not opt out, then "employees are generally precluded from filing suit against [the employer] and must instead pursue their claims through an administrative agency against the employer's insurance carrier for benefits provided for in the TWCA." *Tex. W. Oaks Hosp.*, 371 S.W.3d at 186; *see* TEX. LAB. CODE § 406.031(a) (directing that the insurance carrier be liable for compensation arising out of an employee's on-the-job injury when the employer elects to participate in the workers' compensation system). If, however, "an employer forgoes workers' compensation coverage . . . it is subject to suits at common law for damages." *Tex. W. Oaks Hosp.*, 371 S.W.3d at 187. The employer that forgoes coverage may not assert as a defense in such a suit that "(1) the employee was guilty of contributory

---

[4] For instance, imagine there are two employees: Employee A and Employee B. Employee A's employer elects to opt into workers' compensation and Employee B's employer does not. *See* TEX. LAB. CODE § 406.002(a). Both employees are injured. Ideally, under the workers' compensation laws, both Employee A and Employee B should have a sufficient remedy to redress their injuries. However, Employee B would not recover through workers' compensation insurance, but because the TWCA forecloses non-subscribing employers from invoking common law defenses to recovery. *See id.* § 406.033(a). The concurrence's understanding of the TWCA—that it was enacted for the purpose of regulating the business of insurance—does not acknowledge that the employer, and not insurance, is the source of Employee B's recovery. That is not how we interpret statutes. Instead, we interpret statutes to give meaning to the statute as a whole and render no part superfluous. *See* TEX. GOV'T CODE § 311.021(2); *Ritchie v. Rupe*, 443 S.W.3d 856, 898 (Tex. 2014) (Guzman, J., dissenting); *In re Lee*, 411 S.W.3d 445, 453 (Tex. 2013). A reading that would leave unacknowledged half of an employee's available means of recovery does not honor that command. And this hypothetical does not account for the possibility of a third employee—Employee C—whose employer may utilize common law defenses because the employer opted into workers' compensation insurance while Employee C opted out. *See* TEX. LAB. CODE § 406.034(d).

negligence; (2) the employee assumed the risk of injury or death; or (3) the injury or death was caused by the negligence of a fellow employee." TEX. LAB. CODE § 406.033(a). To be successful in her suit, the employee need only show that her injury was caused by a negligent employer or its agent acting within the course and scope of its agency. *Id.* § 406.033(d).

Second, the Legislature structured the TWCA to discourage employees from opting out of their employer's elective participation in the workers' compensation system. *See Tex. W. Oaks Hosp.*, 371 S.W.3d at 186–87. The benefits offered to the employee who remains in the system include medical benefits, temporary income benefits, impairment income benefits, supplemental income benefits, and lifetime benefits. TEX. LAB. CODE §§ 408.021–.162. The insurance carrier is required by statute to initiate claims within fifteen days of receiving timely notice of the claim, ensuring prompt resolution. *Id.* § 409.021(a). And if a carrier refuses a claim for a groundless reason, it is subject to administrative penalties. *Id.* § 409.022(c). Further, the insurance carrier is required to compensate the injury "without regard to fault or negligence" of the employee or employer. *Id.* § 406.031(a); *see Tex. W. Oaks Hosp.*, 371 S.W.3d at 186 ("But employees need not prove the employer's negligence for workers' compensation recovery . . . ."). While the TWCA allows employees to opt out of their employer's participation in coverage, TEX. LAB. CODE § 406.034(a)–(b), the employer then retains all common law defenses in a suit brought by that employee, including the employee's own negligence. *Id.* § 406.034(d). For such an employee, compensation occurs once litigation is complete or settlement is reached.

> Thus, the workers' compensation construct contemplates two systems, one in which covered employees may recover relatively quickly and without litigation from subscribing employers and the other in which non[-]subscribing employers, or the employers of employees who have opted not to accept workers' compensation coverage, are subject to suit by injured employees to recover for their on-the-job injuries.

13

*Tex. W. Oaks Hosp.*, 371 S.W.3d at 187.

The United States Supreme Court has consistently stated that first-clause MFA cases,[5] like the one before us, apply to state statutes whose purpose is to regulate the relationship between insurer and policyholder. *Fabe*, 508 U.S. at 501 (citing *Nat'l Sec.*, 393 U.S. at 460). Rather than regulating the relationship between insurer and policyholder, the structure of the TWCA supports a conclusion that its purpose is to regulate the relationship between employer and employee. Unlike *Fabe*, in which the Supreme Court noted that the state "priority statute was enacted as part of a complex and specialized administrative structure for the regulation of insurance companies from inception to dissolution," *id.* at 494, the TWCA creates a system that manages on-the-job injury claims between employee and employer.

Although the workers' compensation system is administered by private insurance providers, resulting in private insurance contracts, that does not obviate the fact that its *purpose* and structure is to manage on-the-job injury disputes between employer and employee. *See* 15 U.S.C. § 1012(b); *Cox*, 868 F.3d at 904 (concluding that even if Wyoming's workers' compensation statute were similar to Texas's privatized approach, the MFA would not apply because neither is directed at the business of insurance). Thus, the effect of the TWCA's compensation system "is to empower the" employee and employer to participate in the TWCA, not for insurance carriers to provide insurance—although that may also be a collateral consequence of the system. *See Fabe*, 508 U.S. at 494.

---

[5] The first clause of the MFA reads: "No Act of Congress shall be construed to invalidate, impair, or supersede any law enacted by any State for the purpose of regulating the business of insurance, or which imposes a fee or tax upon such business . . . ." 15 U.S.C. § 1012(b). The second clause allows application of the Sherman Act and Clayton Act "to the business of insurance to the extent that such business is not regulated by State law." *Id.*

14

In *Fredericksburg Care Co.*, we rejected the beneficiaries' request to look past the purpose and structure of the Texas Medical Liability Act to conclude that its potential lowering of insurance premiums meant that it was enacted for the purpose of regulating the business of insurance. 461 S.W.3d at 524. Similarly, here, the fact that the system includes the issuance of insurance contracts does not alter the purpose and structure of the TWCA, which facilitates resolution of on-the-job injury issues between employers and employees.

### B.    Application of the TWCA's Reimbursement Scheme

Although the TWCA as a whole was not enacted "for the purpose of regulating the business of insurance," its reimbursement scheme may still fall within the scope of the MFA. 15 U.S.C. § 1012(b); *see Fabe*, 508 U.S. at 505; *Fredericksburg Care Co.*, 461 S.W.3d at 525. The approach to whether the MFA applies nevertheless remains the same and focuses on whether the challenged provision addresses "the relationship between the insurance company and the policyholder." *Fabe*, 508 U.S. at 501 (quoting *Nat'l Sec.*, 393 U.S. at 460); *see Fredericksburg Care Co.*, 461 S.W.3d at 526–27 (citations omitted) ("Much like the rest of Chapter 74, section 74.451 has little to do with the 'relationship between the insurance company and its policyholders.'").

The concurrence concludes that the parties here have a stronger case that the TWCA and its challenged provisions regulate the business of insurance than the parties in *Fabe*. *Ante* at ___. In *Fabe*, pursuant to a state statute, the Ohio Superintendent of Insurance ordered that the United States, as an obligee, receive fifth priority in an insurance company's liquidation. 508 U.S. at 494–95. This would place the United States, which under federal law would normally receive first priority in liquidation, *see* 31 U.S.C. § 3713(a)(1)(A)(iii), behind a variety of creditors, including insurance "policyholders' claims" and "claims of general creditors." *Fabe*, 508 U.S. at 495. The

15

Supreme Court noted that while the Ohio priority statute fell short of "prescribing the terms of the insurance contract or . . . setting the rate charged by the insurance company," the statute nevertheless regulated the business of insurance because giving priority to a policyholder amounted to "the actual performance of an insurance contract." *Id.* at 502–03. The Court distinguished *Pireno*, a second-clause case, by reasoning that the Ohio law determined whether a policy was performed, while *Pireno* dealt with why a policy was performed. *Id.* at 503 (citing *Union Labor Life Ins. Co. v. Pireno*, 458 U.S. 119, 132 (1982)).

The reimbursement scheme at issue here affects the amount an insurance company must pay a service provider, not whether the policyholder's contract is performed. *See Pireno*, 458 U.S. at 132 (holding that a state law did not regulate the business of insurance when it established a process that was "a matter of indifference to the policyholder, whose only concern is *whether* his claim is paid, not *why* it is paid"). Under the TWCA, the benefit conferred to a policyholder and beneficiary is that neither will be liable for services that fall within the policy's scope of coverage. TEX. LAB. CODE § 408.021. And the insurance company assumes the payment obligation for those covered services, including the medical benefit. *Id.* §§ 401.011(31), 408.021. After the insurance company has concluded that an air-ambulance transport falls within the scope of the medical benefit, and the insured has received the benefit promised to it under the policy, the reimbursement scheme then determines the amount that the insurance company owes the medical service provider. Thus, the reimbursement scheme does not operate to determine *whether* a claim is covered; it operates to determine the amount owed to the service provider. *See Fabe*, 508 U.S. at 503–04; *Pireno*, 458 U.S. at 132. Indeed, the benefit conferred to the policyholder is not the amount an insurance company will pay for the claim, but rather that the insurance company will

16

pay for medical benefits arising under the policy. *See Sullivan*, 331 F. Supp. 3d at 666–67 ("[The TWCA's] policy benefit conferred is the movement of the obligation to pay an air ambulance provider from the insureds to the insurer . . . ."). The employer and injured employee, unlike the policyholders in *Fabe*, need not rely on the challenged reimbursement scheme to receive benefits under the workers' compensation system. *See* 508 U.S. at 503–04.

The Tenth Circuit in *Cox* reached the same conclusion in interpreting Wyoming laws that regulated reimbursement for air-ambulance transports under Wyoming's workers' compensation system. 868 F.3d at 897, 904–05. The Wyoming law allowed reimbursement at "a reasonable charge . . . not in excess of the rate schedule established by the director," *id.* at 898, similar to the Texas reimbursement scheme. *See* TEX. LAB. CODE § 413.011; 28 TEX. ADMIN. CODE §§ 134.1(a), (e)–(f), .203. The court held that the Wyoming law fell outside the scope of the MFA's first clause not because of how Wyoming structured its law—that is, through a state fund rather than private insurance—but because the fee schedule was unrelated to the insurer–policyholder relationship. *Cox*, 868 F.3d at 904–05 (citing *St. Bernard Hosp. v. Hosp. Serv. Ass'n of New Orleans, Inc.*, 618 F.2d 1140, 1145 (5th Cir. 1980)) ("[E]ven if we were to accept the argument that Wyoming's state-run workers' compensation system establishes a type of insurance, we are not persuaded that [the reimbursement scheme] are laws 'regulating the business of insurance.'"). The reimbursement scheme here, too, exists separate and apart from the insurer–policyholder relationship because it relates to the payment of a service and not the scope of coverage.[6]

---

[6] The concurrence notes that the reimbursement scheme identifies the scope of coverage, but the scope of coverage is determined by the policy and whether the employee incurs a medical benefit as determined by the policy. *Ante* at ___; *see Exxon Mobil Corp. v. Ins. Co. of the State of Pa.*, 568 S.W.3d 650, 657 (Tex. 2019). The reimbursement scheme dictates the amount an insurer will pay for the policy obligation, and the Supreme Court has

17

The concurrence is correct that the first clause of the MFA is broader than the second clause, but the meaning of "business of insurance" is the same in both. *See Fabe*, 508 U.S. at 504–05 (focusing on the meaning of "laws 'enacted . . . for the purpose of regulating'" to conclude that the first clause is more expansive than the second clause). That is, if a state law does not involve "the business of insurance," then it was not "enacted . . . for the purpose of regulating the business of insurance." 15 U.S.C. § 1012(b); *see Fabe*, 508 U.S. at 504–05. And in *Group Life & Health Insurance Co. v. Royal Drug Co.*, a second-clause case, the Supreme Court addressed the meaning of business of insurance in the context of payment arrangements between insurers and third-party service providers. 440 U.S. at 213. There, the Supreme Court concluded that the "business of insurance" did not extend to pharmacy arrangements that existed to "minimize the costs" of the insurer but provided no benefit to the insurer other than that its costs would be fixed. *Id.* at 213–14; *see Genord v. Blue Cross & Blue Shield of Mich.*, 440 F.3d 802, 804–07 (6th Cir. 2006) (concluding that reimbursement arrangements mandated by law are not laws enacted for the purpose of regulating the business of insurance). Similarly, here, the reimbursement scheme exists to "minimize the costs" of the workers' compensation insurance carrier. *Royal Drug*, 440 U.S. at 213; *see* TEX. LAB. CODE § 413.011; 28 TEX. ADMIN. CODE §§ 134.1(a), (e)–(f), .203. In this context, the promise made to an employer is that "[the] insurance carrier is liable for compensation for an employee's injury." TEX. LAB. CODE § 406.031(a). The employer is indifferent to the reimbursement formula that affects the insurer and a third-party service provider. *See Royal Drug*,

---

recognized that an arrangement that will limit an insurer's costs for obligations arising under a policy is not the business of insurance. *See Grp. Life & Health Ins. Co. v. Royal Drug Co.*, 440 U.S. 205, 213–14 (1979). And notably, but for the balance-billing prohibition that prevents a health care provider from recouping the remainder of the unpaid bill from the injured employee, *see* TEX. LAB. CODE § 413.042, any additional payment would be sought from the injured employee and not the policy-holding employer. Thus, the scope of the benefit is *not* the amount the service will cost but whether the service qualifies for the type of coverage provided.

440 U.S. at 214 (footnote omitted) ("So long as [the policyholder's prescription cost is fixed], policyholders are basically unconcerned with arrangements made between [the insurer] and participating pharmacies.").

And even if a reimbursement arrangement is mandated by law, that does not mean the MFA protects that arrangement. *Genord*, 440 F.3d 802. Relying on *Royal Drug*, the Sixth Circuit in *Genord* held that a Michigan law obligating health care corporations to enter into reimbursement arrangements with various medical service providers was not a law enacted for the purpose of regulating the business of insurance. *Id.* at 803, 808. The Michigan law, like the law at issue here, mandated terms of the reimbursement arrangement. *Id.* at 803–04; *see* TEX. LAB. CODE § 413.011; 28 TEX. ADMIN. CODE §§ 134.1(a), (e)–(f), .203. Although the law allowed an insurance provider to enter into its own arrangements with medical service providers in limited instances, the law required that—similar to the Texas reimbursement scheme—the service provider "accept payment at the regulated rate." *Genord*, 440 F.3d at 804 (citation omitted); *see* TEX. LAB. CODE § 413.011; 28 TEX. ADMIN. CODE §§ 134.1(a), (e)–(f), .203. Because the reimbursement law did not relate to the coverage of claims for policyholders, but instead to what was owed to service providers, it was not an integral part of the insurance relationship. *Genord*, 440 F.3d at 808 (citing *Royal Drug*, 440 U.S. at 214). Similarly, the TWCA's reimbursement scheme is not integral to the insurance relationship because the policyholders are unaffected and unconcerned with insurers' reimbursement to service providers under the scheme. *See id.* Instead, the prescribed amount that an insurance carrier must pay a third party is not an insurance benefit, but rather an attempt to control the insurer's costs. Thus, these provisions are not "aimed at protecting or regulating" the

19

performance of an insurance contract, *Nat'l Sec.*, 393 U.S. at 460, but rather "the business of insurers." *Royal Drug*, 440 U.S. at 211.

Finally, applying the non-dispositive *Pireno* factors produces the same conclusion that the reimbursement scheme is not part of the "business of insurance." *See Pireno*, 458 U.S. at 129. *Pireno* identified three non-dispositive criteria for evaluating whether a practice is part of the "business of insurance," including whether: "(1) the practice has the effect of transferring or spreading a policyholder's risk; (2) the practice is an integral part of the policy relationship between the insurer and the insured; and (3) the practice is limited to entities within the insurance industry." *Fredericksburg Care Co.*, 461 S.W.3d at 521 (citations omitted). Having already addressed how the provisions relate to the insured–insurer relationship, I turn to the first and third factors.

First, the TWCA's reimbursement scheme does not spread or transfer policyholders' risk. *Royal Drug* held that risk sharing occurs when the insurer spreads the risk it assumes in offering a policy to a single policyholder by offering policies to other policyholders.[7] 440 U.S. at 211 & n.7.

---

[7] The concurrence concludes that the reimbursement scheme spreads policy risk because it assists in determining policy premiums. *Ante* at ___. But a policyholder's receipt of a benefit through an insurance company's reduced cost risk is not spreading policyholder risk. *Royal Drug*, 440 U.S. at 211, 214. Commonly referred to as the Law of Large Numbers, risk sharing is risk aversion, which insurance companies accomplish by increasing the number of policyholders within a pool to make losses more predictable. *See* Michael Murray, *The Law of Describing Accidents: A New Proposal for Determining the Number of Occurrences in Insurance*, 118 YALE L.J. 1484, 1491–92 (2009). The Supreme Court in *Royal Drug* rejected the insurers' argument that arrangements with third parties that limit the amount insurers must pay for policyholder claims represent risk sharing. 440 U.S. at 211 & n.7. Instead, the Court concluded such arrangements are risk reduction. *Id.* Similarly, the TWCA's reimbursement scheme does not add to the pool of policyholders—risk share—it limits the amount that an insurance company must pay—risk reduction—to satisfy obligations to a medical service provider. *See id.* Whether an insurance company's reimbursement obligation to a provider is limited because the insurance company optionally entered into such an arrangement, or because the arrangement was prescribed by statute, has no bearing on whether the arrangement amounts to risk sharing. *Genord*, 440 F.3d at 804, 806–07. This is true even if the reimbursement arrangement results in benefits to the policyholder in the form of lower premiums. *Royal Drug*, 440 U.S. at 214 (footnote omitted) ("Such cost-savings arrangements may well be sound business practice, and may well inure ultimately to the benefit of policyholders in the form of lower premiums, but they are not the 'business of insurance.'").

20

Risk reduction through a reimbursement arrangement or scheme is not risk sharing because the reduction affects only the insurer's liability under a given policy. *Id.* at 211 n.7. Even if third-party cost constraints may "inure ultimately to the benefit of policyholders," those constraints are still not the business of insurance. *Id.* at 214. At most, the reimbursement scheme is simply that: a cost constraint that inures some benefit to an employer. The limits merely represent what an insurer must pay to satisfy its obligations to a service provider. The insurer assumes the responsibility to pay under the policy with the insured—risk shares—and the reimbursement scheme operates as a constraint on the insurer's costs separate and apart from the agreement with the insured. *See id.*; *Pireno*, 458 U.S. at 130–31.

Second, payments to air-ambulance transports are not to entities within the insurance industry. The Supreme Court held in *Pireno* that a New York law allowing health insurers to use a peer-review system to determine the necessity and use of chiropractic treatments did not regulate the business of insurance. 458 U.S. at 134. In discussing the third *Pireno* factor, the Supreme Court noted that the system "inevitably involve[d] third parties wholly outside the insurance industry—namely, practicing chiropractors." *Id.* at 132. The business of insurance excludes "[a]rrangements between insurance companies and parties outside the insurance industry." *Id.* at 133. Much like the chiropractors in *Pireno*, air-ambulance transports offer a service that might satisfy a benefit under an insurance policy. *See id.* at 122–23. However, also like *Pireno*, that does not render limits on what an insurer may pay an air-ambulance transport "the business of insurance." *See id.* at 132–33. The scheme is akin to an agreement between insurance companies and those outside the industry because the scheme represents the amount that an insurance company must pay to a third party to satisfy the insurer's obligations under a policy. *See id.* at

21

133; *Genord*, 440 F.3d at 808–09; *Air Evac EMS, Inc.*, 331 F. Supp. 3d at 666. The reimbursement scheme's cost limits are directed not at insurers but rather at service providers. That is, the reimbursement scheme is directed at air-ambulance markets and does not represent "'*intra*-industry cooperation' in the underwriting of risks." *Pireno*, 458 U.S. at 133 (citations omitted); *see Genord*, 440 F.3d at 808 (doctors providing gynecological services are not within the insurance industry). Therefore, under *Pireno*, the TWCA's reimbursement scheme is not aimed at protecting or regulating the performance of an insurance contract and does not regulate the business of insurance.

### III.    Conclusion

I cannot join the Court in concluding that the TWCA's reimbursement scheme avoids or is saved from preemption. The reimbursement scheme relates to a price of an air carrier, and is thus preempted by the ADA, because it limits the amount that an air carrier may charge for its services. Further, the MFA does not reverse preempt the TWCA or its reimbursement scheme because neither was enacted for the purpose of regulating the business of insurance, as understood by the United States Supreme Court. The TWCA was enacted to manage on-the-job injury claims by encouraging participation in the workers' compensation system and discouraging parties from resorting to litigation. Further, the reimbursement scheme regulates the relationship between the insurer and third-party service providers rather than the "business of insurance." Because I would affirm the court of appeals' judgment, I respectfully dissent.

_____
Paul W. Green
Justice

22

**OPINION DELIVERED:** June 26, 2020